# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| **LIBORIO III, L.P.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **C.A. No. N22C-06-109 PRW** |
| | ) | |
| **ARTERSAN WATER COMPANY, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: December 9, 2022
Decided: February 14, 2023

## MEMORANDUM OPINION AND ORDER

*Upon Artesian Water Company's Motion to Dismiss,*
**GRANTED.**

L. Vincent Ramunno, Esquire, RAMUNNO & RAMUNNO, P.A., Wilmington, Delaware. *Attorney for Plaintiff Liborio III, L.P.*

Colin D. Dougherty, Esquire, FOX ROTHSCHILD LLP, Blue Bell, Pennsylvania; Courtney A. Emerson, Esquire, ARTESIAN WATER COMPANY, INC., Wilmington, Delaware. *Attorneys for Defendant Artesian Water Company, Inc.*

**WALLACE, J.**

# I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Liborio III, L.P. is a limited partnership organized and operated in the State of Delaware.[1] Defendant Artesian Water Company, Inc. is a Delaware public utility company regulated by the Delaware Public Service Commission ("PSC").[2]

Liborio owns a land development project, Bower's Landing, that is in Kent County, Delaware.[3] Bower's Landing currently consists of 184 recorded single-family lots.[4] And the entirety of the project is located within Artesian's water service monopoly.[5]

On July 30, 2002, Liborio and Artesian entered into a service territory agreement (the "Service Territory Agreement") where Artesian would be granted the exclusive right to service Bower's Landing.[6] The Service Territory Agreement contemplated later water services agreements broken up into phases for groups of specific lots being serviced.[7] The 2002 Service Territory Agreement had a refund

---

[1] Compl. ¶ 1, *Liborio III, L.P. v. Artesian Water Co.*, C.A. No. N22C-06-109 PRW (Del. Super. Ct. June 15, 2022) (D.I. 1).

[2] *Id.* ¶ 2; Mot. to Dismiss ¶ 15, July 13, 2022 (D.I. 4).

[3] Compl. ¶ 3.

[4] *Id.*

[5] *Id.* ¶ 4.

[6] *Id.* ¶ 5. The Service Territory Agreement is attached as Exhibit A to Defendant's Motion to Dismiss. Mot. to Dismiss, Ex. A ("Service Territory Agreement").

[7] Compl. ¶¶ 6-7; Service Territory Agreement ¶ 3.

provision that reads:

> Upon completion of each phase's installation, the final actual cost of the mains and hydrants will be computed and said cost, less the 15% overheads, shall be refundable to Owner at the rate of 15% of the net billings for water service and public fire protection for a period of twenty (20) years.[8]

Two years after the Service Territory Agreement was executed the parties entered into their first water services agreement for the Phase I development of Bower's Landing.[9]  Between that Phase I Water Services Agreement and a Phase II Water Services Agreement, which was signed in 2020,[10] the PSC promulgated PSC Order No. 6873, which provides in relevant part that:

> 1.3.12 <u>CONTRIBUTION IN-AID-OF CONSTRUCTION ("CIAC")</u>
>
> Cash, services, funds, property or other value received from State, municipal, or other governmental agencies, individuals, contractors, or others for the purpose of constructing or aiding in the construction of utility plant and which represent a permanent infusion of capital from sources other than utility bondholders or stockholders.
>
> 3.8.1 <u>CIAC REQUIREMENT FOR FACILITIES EXTENSIONS</u>
>
> A utility shall require a CIAC when the request for a Facilities Extension will require the installation of pipe and/or associated utility plant. All charges henceforth to contractors, builders, developers, municipalities, homeowners, or other project sponsors, seeking the construction of water Facilities from a water utility company shall be

---

[8]   Service Territory Agreement ¶ 3.

[9]   *See* Compl. ¶¶ 7-8 (stating "Artesian has been making the refund payments for Phase 1 of the said project"); Response to Def.'s Mot. to Dismiss ("Response") at 12, Aug. 31, 2022 (D.I. 13) (stating the Phase I Water Services Agreement was entered into 20 months after the Service Territory Agreement was executed).

[10]   Compl., Ex. B. ("Phase II Water Services Agreement").

in the form of a CIAC to be paid to the water utility as Category 1A, 1B and Category 2 costs, as computed under §§3.8.2 and 3.8.6, subject to true-up under §3.8.8.

### 3.8.2 COMPUTATION OF CIAC

Category 1A Costs.

All on-site Facilities costs that are directly assignable to a specific project are Category 1A costs and shall be designated by the utility and paid for by the contractor, builder, developer, municipality, homeowner, or other project sponsor, as CIAC, with no refunds. These costs include such items as Mains, hydrants, treatment plants, wells, pump stations, storage facilities, and shall include any other items that are necessary for the provision of utility water service. The cost of a Facilities Extension from the furthest point of the project site up to a point 100 feet beyond the boundary of the project (in the direction of the utility's existing Main) shall be considered a Category 1A Cost.

Category 1B Costs.

All off-site Facilities costs that are directly assignable to a specific project from such point 100 feet beyond the boundary of the project and continuing to the utility's existing Main are Category 1B Costs and shall be designated by the utility and funded by the contractor, builder, developer, municipality, homeowner, or other project sponsor, as a CIAC not subject to refund. These costs include such items as Mains, hydrants, treatment plants, wells, pump stations, storage facilities, and shall include any other items that are necessary for the provision of utility water service. Notwithstanding the foregoing, Category 1B Costs shall not include, and the utility shall be entitled to pay for and include in its rate base, any additional Facilities costs elected to be incurred by the utility in connection with the Facilities Extension for company betterment. In determining whether Category 1B Costs are directly assignable to a project, or elected as company betterment, the CIAC shall be calculated based on the cost of installing Mains using a minimum of 8 inch diameter pipe, *provided, however,* that where Mains of a larger diameter are required by applicable laws, building or fire codes, or engineering standards to provide water service to the project on a stand-alone basis, the CIAC shall be calculated based on

the cost of installing Mains using such larger diameter pipe.[11]

3.8.9 <u>MISCELLANEOUS;    CLASS    A    WATER    UTILITIES AFFECTED;  PROSPECTIVE  APPLICATION;  REOPENING OF DOCKET</u>

The regulations governing CIAC and Advances shall:

1. apply only to Class A Water Utilities, and

2. apply prospectively and therefore shall not affect or apply to circumstances where the water utility has already entered into a water service agreement with the contractor, builder, developer, municipality, homeowner, or other person, regarding the construction of water facilities.

PSC Regulation Docket 15 shall be reopened two years from the effective date of the revised regulations governing CIAC and Advances to review the extension methodology and to assess its effectiveness, and the CIAC computation and costs categories. After such review and assessment, the Commission may, if deemed appropriate, consider further modifications.[12]

More than a decade after this regulation was promulgated, Artesian and Liborio entered into their Phase II Water Services Agreement.[13]  That agreement provided in pertinent part that:

For all future phases of the Bowers Landing development Owner shall pay Artesian all contributions in aid of construction ('CIAC') then required by Sections 3.8 through 3.8.9 of the Public Service Commission's Minimum Service Standards Covering Service by Public Water Companies, PSC Order No. 6873, if any, and any and all costs

---

[11]  9 Del. Reg. 1588 (Apr. 1, 2006) (emphasis in original) (Public Service Commission Order No. 6873).

[12]  *Id.*

[13]  Phase II Water Services Agreement.

related thereto, including, if then applicable, tax at the state and federal level as a consequence of the Tax Cuts and Jobs Act of 2017.[14]

Additionally, Paragraph 27 of that agreement provided:

> This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes all previous representations and understandings, oral or written, between the Parties. This Agreement may be amended, modified, waived, rescinded or otherwise changed only through a written instrument signed by both Parties. Any additional or different terms that either party subsequently delivers to the other party through drawings, specifications, invoices or other communications or documents are objected to and shall not be binding unless specifically accepted in writing by an authorized representative of the other party.[15]

Liborio has filed suit against Artesian for breach of contract (Count I) and fraud (Count II).[16] In its first cause of action, Liborio contends that Artesian breached the Service Territory Agreement, along with the Phase II and Phase III Water Services Agreements[17] by: (a) requiring Liborio pay the CIAC fees, and (b) failing to refund Liborio the costs of the mains and hydrants as required by the

---

[14] *Id.* ¶ 3.

[15] *Id.* ¶ 27.

[16] Compl. ¶¶ 22-37.

[17] It is not clear from the Complaint and the record which water services agreements Liborio alleges was breached. The only water services agreement included in the Complaint is the Phase II Water Services Agreement. But Liborio asserts that "Defendant is liable for any CIAC fees Plaintiff paid that were not owed for phases 3 and 4 and refundables for past and future phases as specified in the parties' 2002 Service Territory Agreement." *Id.* at 7. Liborio never avers, nor is it clear from the Complaint, that the Phase IV Water Services Agreement was entered into. If the parties have not entered into the Phase IV Water Services Agreement, then there is no breach of contract. Accordingly, the Court will analysis only the Service Territory Agreement, the Phase II Water Services Agreement, and the Phase III Water Services Agreement.

Service Territory Agreement.[18] In its second cause of action, Liborio contends that Artesian intentionally provided Liborio with knowingly false information so as to induce it to enter into the latter water services agreements and to enrich Artesian.[19]

Artesian has moved to dismiss both claims under Superior Court Civil Rules 12(b)(1), 12(b)(6), and 9(b).[20]

## II. PARTIES' CONTENTIONS

### A. ARTESIAN'S CONTENTIONS

Artesian makes three arguments for dismissal. First, Artesian asserts that Liborio's claims must be dismissed because the Court lacks jurisdiction to hear the case.[21] Specifically, Artesian insists that because it is a regulated public utility, the PSC has exclusive original jurisdiction over this action.[22]

Second, Artesian argues that there was neither breach nor fraud because PSC Order No. 6873 plainly applies to the Phase II and subsequent water services agreements.[23] To Artesian, the Service Territory Agreement simply set up the framework for the parties' relationship.[24]

---

[18] *Id.* ¶¶ 29-32 ("Consequently, Defendant is contractually and legally obligated to pay Plaintiff the CIAC advances and the required refunds due in the past and future of the said project.").

[19] *Id.* ¶¶ 33-37.

[20] Mot. to Dismiss at 2.

[21] *Id.* ¶¶ 15-20.

[22] *Id.* ¶¶ 15-18.

[23] *Id.* ¶¶ 22-27.

[24] *Id.*

Third, Artesian argues that Liborio hasn't pled its fraud claim with particularity nor could it because the requisite *prima facie* elements for bringing a fraud claim are, in reality, lacking.[25]

## B. LIBORIO'S COUNTER

Concerning the breach-of-contract claim, Liborio insists that the action is plainly for breach of contract and fraud and does not implicate the PSC in any way.[26] And, in Liborio's view, the Service Territory Agreement controls any subsequent agreements which means the water services agreements cannot deviate from the Service Territory Agreement's terms.[27]

Concerning the fraud claim, Liborio contends that it has pled the elements of a *prima facie* fraud claim.[28] Liborio says that Artesian's agent "misrepresented and intentionally led" Liborio to believe that the CIAC fee was the only change made by the PSC before the signing of the Phase II agreement, even though Artesian knew certain changes also affected the mains and hydrants refund.[29] Artesian's intent in not highlighting these published regulatory changes, Liborio claims, was to induce

---

[25]  *Id.* ¶¶ 28-35.

[26]  Response at 10-11 ("It is simply a breach of contract and fraud claim. This Court clearly has jurisdiction and Artesian's Motion must be denied.").

[27]  *Id.* at 11-13; *see id.* at 12 ("Artesian cannot unilaterally pick and choose which parts of the 2002 Agreement are controlling and which are not.").

[28]  *Id.* at 14-15.  Liborio calls its claim "fraud action" but it really is a fraudulent inducement claim.  *See* Compl. ¶¶ 33-37.

[29]  Response at 15.

Liborio to enter the Phase II Water Services Agreement and subsequent agreements.[30] And, according to Liborio, it relied on those misrepresentations when it signed onto the Phase II Water Services Agreement and subsequent agreements.[31]

## III. STANDARD OF REVIEW

### A. MOTIONS TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

A party may move to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction.[32] And "[w]henever it appears by suggestion of the parties or otherwise that the Court lacks subject matter jurisdiction, the Court must dismiss the claim."[33] In considering a Rule 12(b)(1) motion, the Court "need not accept [the plaintiff's] factual allegations as true and is free to consider facts not alleged in the complaint."[34] Accordingly, whereas the movant "need only show that the Court lacks jurisdiction,"[35] the non-movant bears the "far more demanding" burden "to prove

---

[30] *Id.* ("The intent was to induce Louis to agree to the Phase 2 contract.").

[31] *Id.* ("Relying on the above misrepresentations, Louis signed the Phase 2 contract . . . .").

[32] Super. Ct. Civ. R. 12(b)(1).

[33] *KT4 P'rs LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *24 (Del. Super. Ct. June 24, 2021) (cleaned up).

[34] *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1284 n.14 (Del. 2007) (citation omitted); *see Nelson v. Russo*, 844 A.2d 301, 302 (Del. 2004) ("In deciding whether the Superior Court has subject matter jurisdiction, however, we must look beyond the language in the complaint . . . ." (citing *Diebold Computer Leas., Inc. v. Com. Credit Corp.*, 267 A.2d 586, 588 (Del. 1970)); *see also Texcel v. Com. Fiberglass*, 1987 WL 19717, at *2 (Del. Super. Ct. Nov. 3, 1987) ("The gravamen of subject matter jurisdiction, however, lies not in the pleading but in the existence of the facts necessary for the court to exercise its jurisdiction." (citation omitted)).

[35] *Airbase Carpet Mart, Inc. v. AYA Assocs., Inc.*, 2015 WL 9302894, at *2 (Del. Super. Ct. Dec. 15, 2015) (citing Super. Ct. Civ. R. 12(b)(1)), *aff'd*, 2016 WL 4938890 (Del. Sept. 16, 2016).

jurisdiction exists."[36]

## B. MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

"Under Superior Court Civil Rule 12(b)(6), '[t]he legal issue to be decided is, whether a plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint.'"[37] Under that Rule, the Court will

> (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claims] unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[38]

"If any reasonable conception can be formulated to allow Plaintiffs' recovery, the motion must be denied."[39] This is because "[d]ismissal is warranted [only] where the plaintiff has failed to plead facts supporting an element of the claim, or that under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[40]

---

[36] *Appriva*, 937 A.2d at 1284 n.14 (citation omitted).

[37] *Vinton v. Grayson*, 189 A.3d 695, 700 (Del. Super. Ct. 2018) (alteration in original) (quoting Super. Ct. Civ. R. 12(b)(6)).

[38] *Id.* (alteration in original) (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011)).

[39] *Id.* (citing *Cent. Mortg. Co.*, 27 A.3d at 535).

[40] *Hedenberg v. Raber*, 2004 WL 2191164, at *1 (Del. Super. Ct. Aug. 20, 2004) (citation omitted).

Now, the complaint generally confines "the universe of facts" the Court might consider on a Rule 12(b)(6) motion.[41] But, "for carefully limited purposes,"[42] the Court "may consider matters outside the pleadings when the document is integral to a claim and incorporated into the complaint."[43] And "a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law."[44]

Delaware law requires those pleading fraud and misrepresentation to do so with particularity—a heightened pleading standard.[45] To satisfy Rule 9(b), a fraud or misrepresentation claim must allege:

> (1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations. Essentially, the plaintiff is required to allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim.[46]

## IV. DISCUSSION

### A. THIS COURT HAS JURISDICTION TO HEAR THE CLAIMS.

Under 26 *Del. C.* § 201, "[t]he Delaware General Assembly has conferred on

---

[41] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (citations omitted).

[42] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995) (citation omitted).

[43] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 873 (Del. 2020) (cleaned up).

[44] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001) (citations omitted).

[45] Super. Ct. Civ. R. 9(b).

[46] *Abry P'rs V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) (citation omitted).

the Public Service Commission 'exclusive original' jurisdiction over public utilities."[47] And under 26 *Del. C.* § 510, the General Assembly has made the final orders of the Public Service Commission appealable to the Superior Court.[48]

The statutory scheme itself provides that:

> The Commission shall have exclusive original supervision and regulation of all public utilities and also over their rates, property rights, equipment, facilities, service territories and franchises so far as may be necessary for the purpose of carrying out the provisions of this title. Such regulation shall include the regulation of the rates, terms and conditions for any attachment (except by a governmental agency insofar as it is acting on behalf of the public health, safety or welfare) to any pole, duct, conduit, right-of-way or other facility of any public utility, and, in so regulating, the Commission shall consider the interests of subscribers, if any, of the entity attaching to the public utility's facility, as well as the interests of the consumer of the public utility service.[49]

While both parties argue over subject matter jurisdiction, the real issue presented here is one of exhausting administrative remedies. So neither Rule 12(b)(1) nor 12(b)(6) are squarely implicated.[50] The doctrine of exhaustion of administrative remedies applies "where a claim must be initiated before an administrative agency which has exclusive jurisdiction over the matter and is able to provide an adequate remedy."[51] The application of this doctrine is a matter of

---

[47] *Pub. Serv. Comm'n v. Diamond State Tel., Co.*, 468 A.2d 1285, 1298 (Del. 1983).

[48] *Id.*

[49] DEL. CODE ANN. tit. 26, § 201(a) (2022).

[50] *Levinson v. Del. Comp. Rating Bureau, Inc.*, 616 A.2d 1182, 1187 (Del. 1992).

[51] *Id.* (citing *E. Shore Natural Gas Co. v. Stauffer Chem. Co.*, 298 A.2d 322, 325 (Del. 1972)).

-11-

judicial discretion, not jurisdiction.[52] If the Court invokes the doctrine, then it can dismiss an action or stay it pending the outcome of the administrative adjudication.[53]

As this Court found in *Liborio II, L.P. v. Artesian Water Company, Inc.*, breach-of-contract and related claims are generally "within the traditional jurisdiction" of the Superior Court.[54] But in determining whether the Court or the PSC has initial jurisdiction, the Court must "look behind the[] contentions, examine the gravamen of plaintiffs' action and determine whether there is a claim within the province of the PSC or the authority of this Court."[55]

The Court in *Liborio II* retained jurisdiction over those breach-of-contract claims because the question concerned whether the defendant "performed the services required of it under the contracts."[56] In addition, the Court found the record incomplete and that it could benefit from further fact-finding.[57] But the Court held that it did not have jurisdiction over the unjust enrichment claims because those

---

[52] *Id.* at 1189. When appropriate, the Delaware Supreme Court concluded that there is a "strong presumption in favor" of requiring exhaustion, absent "compelling" reasons for why the Superior Court should initially hear a claim. *Id.* at 1192.

[53] *In re Olenderski*, 1994 WL 374305, at *2 (Del. Ch. June 10, 1994) ("As a result, plaintiff's suit before this Court should be dismissed or stayed pursuant to the doctrine of exhaustion of administrative remedies."). *See Levinson*, 616 A.2d at 1187 ("application of the doctrine of exhaustion of administrative remedies *may* result in dismissal from the judicial forum" (emphasis added) (citation omitted)).

[54] 593 A.2d 571, 574 (Del. Super. Ct. 1990) (citations omitted).

[55] *Id.* at 574-75 (citations omitted).

[56] *Id.* at 575.

[57] *See id.*

-12-

"attack[ed] the reasonableness of a rate established by the PSC."[58]  Specifically, the
Court found "[t]he determination of the unjustness or unreasonableness of a rate
charged by a regulated utility is the subject matter of an appropriate regulatory
agency."[59]

Here, the gravamen of Liborio's breach-of-contract action is the applicability
of the PSC regulation and its potential effect on payments a party to a contract might
owe.  The only pertinent question is of regulatory interpretation and in this context
is one the Court is more than equipped to—and of a type the Court regularly does—
address.

Additionally, the fraud claim, which relates to the breach-of-contract claim,
concerns the alleged fraudulent inducement of Liborio into the Phase II and
subsequent water services agreements.  Accordingly, the gravamen here is the
inducement, and not the interpretation or enforcement of the PSC regulation.  Thus,
this Court has jurisdiction over that claim too.

## B. THE FRAUDULENT INDUCEMENT CLAIM CANNOT SURVIVE.

Liborio alleges that Artesian fraudulently induced it to enter into the Phase II
and subsequent water services agreements by omission when it purportedly falsely

---

[58]  *Id.*

[59]  *Id.* (citations omitted).

characterized or withheld the effects of the PSC regulation.[60] Liborio says this was an intentional act of information withholding meant to increase Artesian's profits.[61] Last, Liborio suggests that it was justified in relying on Artesian's verbal characterizations of both the written agreements and the published PSC regulation— no matter what the writings contained.[62]

The elements of fraudulent inducement are:

(1) a false statement or misrepresentation; (2) that the defendant knew was false or made with reckless indifference to the truth; (3) the statement induced the plaintiff to enter the agreement; (4) the plaintiff's reliance was reasonable; and (5) the plaintiff was injured as a result.[63]

Liborio conceded that the entire fraud theory rested on its postulation that an Artesian representative had lied as to whether the "new regulations applied only prospectively."[64] Moreover, Liborio conceded that it did not read the PSC regulation, but argues that Artesian was not only obligated to alert Liborio of the PSC change, and how it affected the water services agreements, but that by mentioning only the CIAC fee change and not the refund change, Artesian

---

[60]  Response at 14-15.

[61]  *Id.*

[62]  *Id.*; Compl. ¶¶ 14-15.

[63]  *ITW Global Invs. Inc. v. Am. Indus. P'rs Cap. Fund IV, L.P.*, 2017 WL 1040711, at *6 (Del. Super. Ct. Mar. 6, 2017) (citation and internal quotation marks omitted).

[64]  Oral Arg. at 12, Dec. 9, 2022 (D.I. 22).

fraudulently induced Liborio into entering the water services agreements.[65] Important to the Court's decision here, the unread PSC regulation was expressly and clearly referenced in the Phase II Water Services Agreement.[66]

Liborio cannot meet the necessary elements of its fraudulent inducement claim. And the reason for this is simple—Liborio, a company more than adequately represented by counsel, failed to fully read its contracts and related documents, so it cannot possibly claim that reliance on an Artesian representative's verbal representations—or more aptly as Liborio pleads it, his failure to notify Liborio of the law—alone was reasonable.

Liborio's theory is this: a layperson from Artesian did not expressly alert Liborio's signing representative—a member of the Delaware bar himself—to the effects of a specific regulation (expressly referenced in the Phase II Water Services Agreement) on the Service Territory Agreement which was signed almost two-decades earlier. And the layperson's supposedly knowingly not doing so somehow was an intentional misrepresentation made to induce Liborio to sign the agreement

---

[65]   *Id.* at 14 ("I still would not have known about these regulations because there's no reason to know about it until something pops up."); Compl. ¶ 12 ("Gould intentionally led Plaintiff to believe that the said CIAC payment by Plaintiff was the only change made by the PSC regulation . . . .").

[66]   Phase II Water Services Agreement ¶ 3 ("For all future phases of the Bowers Landing development Owner shall pay Artesian all contributions in aid of construction ('CIAC') then required by Sections 3.8 through 3.8.9 of the Public Service Commission's Minimum Service Standards Covering Service by Public Water Companies, PSC Order No. 6873, if any, and any and all costs related thereto, including, if then applicable, tax at the state and federal level as a consequence of the Tax Cuts and Jobs Act of 2017.").

that contained specific reference to that regulation. This suggested deliberate and misleading silence is not enough to make out the elements of fraud here. Put simply, Liborio's failure to read and know the terms of its own written contracts and relevant regulations clearly and expressly referenced in those contracts doom its claim.[67]

Thus, Liborio has failed to successfully plead the elements of its fraudulent inducement claim. Artesian's motion to dismiss Count II must, therefore, be **GRANTED**.

## C. ARTESIAN DID NOT BREACH ITS CONTRACTS WITH LIBORIO.

Liborio asserts that Artesian breached its contracts by requiring Liborio to pay CIAC fees and failing to refund it for the mains and hydrants expenses.[68] Artesian argues the PSC regulation applies to the parties' post-2006 agreements.[69] And that regulation, Artesian says, requires Artesian to demand CIAC fees and doesn't allow

---

[67] *Carrow v. Arnold*, 2006 WL 3289582, at *11 (Del. Ch. Oct. 31, 2006) ("Fraudulent inducement is not available as a defense when one had the opportunity to read the contract and by doing so could have discovered the misrepresentation. Because Carrow had such an opportunity, any reliance he placed on prior, inconsistent, oral promises or representations was unreasonable." (internal quotation marks and citations omitted)), *aff'd*, 933 A.2d 1249 (Del. 2007).

[68] *See* Compl. ¶¶ 22-32. There is disagreement about whether the CIAC fees and the refunds are essentially the same. *Compare* Compl. ¶ 24 ("CIAC contributions are totally different and unrelated to Defendant's refund obligation."), *with,* Response at 8 ("This is puzzling, as per the PSC's definitions, the CIAC and what Plaintiff is referring to as the refunds are one and the same." (citations omitted)).

The refund at issue is for mains and hydrants. Service Territory Agreement ¶ 3. The term CIAC fee was not used in the Service Territory Agreement. But given that PSC Order No. 6873 defines mains and hydrants as CIAC Category 1A Costs, they appear to be equivalent here. The Court separately finds that Artesian can demand CIAC fees from Liborio, and that Artesian has no obligation to refund Liborio.

[69] Mot. to Dismiss ¶¶ 22-27.

it to refund Liborio.[70] Liborio says the Service Territory Agreement was entered before the PSC regulation and thus by the terms of the regulation itself, it does not apply here.[71]

Because regulatory interpretation presents a question of law, and not a question of fact, the Court can resolve such on a motion to dismiss.[72] But, while "the interpretation of a contract is a question of law suitable for determination on a motion to dismiss . . . dismissal is proper only if the defendants' interpretation is the only reasonable construction as a matter of law."[73]

In 2002, Artesian and Liborio entered into the Service Territory Agreement. That agreement laying out the basic terms for providing water service to Bower's Landing.[74] Twenty months later, Artesian and Liborio entered into the Phase I Water Services Agreement.[75] That agreement is not at issue here.

In April 2006, between the execution of the Phase I and Phase II Water Services Agreements, the PSC enacted Order No. 6873, which "shall not affect or apply to circumstances where the water utility has already entered into a *water*

---

[70] *Id.*

[71] Response at 11-13.

[72] *See in re Port of Wilm. Gantry Crane Litig.*, 238 A.3d 921, 927 (Del. Super. Ct. 2020).

[73] *Vinton*, 189 A.3d at 699-700 (cleaned up).

[74] Service Territory Agreement.

[75] Response at 12.

-17-

*service[s] agreement . . . .*"[76]

Then in May of 2020, Artesian and Liborio entered into the Phase II Water Services Agreement.[77] Paragraph 3 of that agreement read:

> For all future phases of the Bowers Landing development Owner shall pay Artesian all contributions in aid of construction ('CIAC') then required by Sections 3.8 through 3.8.9 of the Public Service Commission's Minimum Service Standards Covering Service by Public Water Companies, PSC Order No. 6873, if any, and any and all costs related thereto, including, if then applicable, tax at the state and federal level as a consequence of the Tax Cuts and Jobs Act of 2017.[78]

Moreover, Paragraph 27 of that agreement read:

> This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and *supersedes all previous representations and understandings, oral or written, between the Parties*. This Agreement may be amended, modified, waived, rescinded or otherwise changed only through a written instrument signed by both Parties. Any additional or different terms that either party subsequently delivers to the other party through drawings, specifications, invoices or other communications or documents are objected to and shall not be binding unless specifically accepted in writing by an authorized representative of the other party.[79]

Liborio argues the Service Territory Agreement is essentially a water services agreement of its own[80] but that argument is unpersuasive because: (a) Liborio itself

---

[76] 9 Del. Reg. 1588 § 3.8.9 (Apr. 1, 2006) (emphasis added) (Public Service Commission Order No. 6873).

[77] Phase II Water Services Agreement.

[78] *Id.* ¶ 3.

[79] *Id.* ¶ 27 (emphasis added).

[80] *See* Response at 11-13.

doesn't call the agreement a water services agreement, rather it calls the agreement a "Service Territory Agreement"; (b) the more general Service Territory Agreement expressly anticipates the more specific subsequent agreements that are the "Water Service[s] Agreement[s]"; and (c) other agreements entered into by the parties are not only titled water services agreements, but on their face include fundamentally different information, rights, and responsibilities from the Service Territory Agreement.

So, the initial Service Territory Agreement is not a water services agreement. But the Phase II Water Services Agreement and subsequent water services agreements are. And so, the PSC Order applies to them. The question remaining then is whether Artesian breached any contract by demanding CIAC fees and not refunding Liborio.

To plead a breach-of-contract claim, a plaintiff must show (1) "the existence of the contract, whether express or implied," (2) "the breach of an obligation imposed by that contract," and (3) "the resultant damage to the plaintiff."[81] Here, Liborio cannot show that a contractual obligation was breached—Artesian can demand CIAC fees from Liborio and Artesian is not required to refund Liborio.

The initial Service Territory Agreement contemplated that Artesian would

---

[81] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (citations omitted).

receive a refund for the installation of the mains and hydrants.[82]  But things changed.

And the PSC Order and later Phase II Water Services Agreement barred that refund.

Specifically, the PSC Order states that all Category 1A Costs—which include

"[m]ains" and "hydrants"—"shall be designated by the utility and paid for by the

contractor, builder, developer, municipality, homeowner, or other project sponsor,

*as CIAC, with no refunds*."[83]  And the Phase II Water Services Agreement expressly

superseded all preceding agreements by the parties on this exact subject matter.[84]

Moreover, the PSC Order states that the CIAC provisions shall "[a]pply

prospectively and therefore shall not affect or apply to circumstances where the

water utility has already entered into a water service agreement . . . ."[85]  As stated

above, both the Phase II Water Services Agreement and subsequent water services

---

[82]   Service Territory Agreement ¶ 3 ("Upon completion of each phase's installation, the final actual cost of the mains and hydrants will be computed and said cost, less the 15% overheads, shall be refundable to Owner at the rate of 15% of the net billings for water service and public fire protection for a period of twenty (20) years. Refunds shall be provided on a yearly basis.").

[83]   9 Del. Reg. 1588 § 3.8.2 (emphasis added) (Computation of CIAC).

[84]   Phase II Water Services Agreement ¶ 27.  Liborio asserts that subject matter of the Phase II Water Services Agreement is the specific lots being serviced.  Response at 12.  And even if it is not, ambiguity surrounding the contracts should lead the Court to allow the breach-of-contract claim to survive.  *Id.* at 13.  The Court discerns no ambiguity.

Additionally, as asserted only in Liborio's Complaint but not argued in its answering brief, Liborio says the Phase II Water Services Agreement is invalid as Artesian's alleged "waiver" of the CIAC fee meant there was no *quid pro quo*.  Compl. ¶ 31 ("The CIAC payment that was 'waived' by the Defendant so that Plaintiff would sign the proposed agreement was not owed by the Plaintiff and therefore there was no consideration and the agreement is not enforceable.").  The Phase II Water Services Agreement is clearly supported by consideration—Artesian provided water services in exchange for money, so Liborio's CIAC fee waiver argument lacks any merit.

[85]   9 Del. Reg. 1588 § 3.8.9.

agreement were entered into after the promulgation of the PSC Order so the PSC Order applies to them and Artesian can demand CIAC fees.

At bottom, Artesian has not breached any obligation imposed by any contract with Liborio and Liborio's breach-of-contract claim must fail.

Accordingly, Artesian's motion to dismiss that breach-of-contract claim is also **GRANTED**.

## V. CONCLUSION

Liborio's breach-of-contract claim (Count I) and fraudulent inducement claim (Count II) both fail as a matter of law. Accordingly, Artesian's motion to dismiss Liborio's complaint is **GRANTED**.

**IT IS SO ORDERED.**

_____
Paul R. Wallace, Judge

cc: All Counsel via File and Serve